Right when the parties are ready, we'll be proceeding in 360 Mortgage Group, LLC v. Home Point Financial Corporation. Mr. Wilkins. May it please the court, my name is Billy Wilkins and while Kirsten Small and I did not represent 360 in the district court, we do on this appeal. Judge Fox's order reads like a decision he would hand down after conducting a bench trial rather than ruling on a motion for summary judgment. But I guess I should not complain too loudly about it because taking his order, it clearly establishes at least a prima facie case of misappropriation of trade secrets. 360 Mortgage is asking this court to reverse Judge Fox and give us a chance, a chance to present our case to a jury, the proper fact finder. As this court held in Cosmopolis along with the Second Circuit, the Fifth Circuit, the Seventh, the Eighth, and the Eleventh, the existence of a trade secret is generally an issue of fact left to the jury, not to the judge. Does the Supreme Court's decision on North Carolina a couple of weeks or so ago help you in this case? I think it should, I think it should, absolutely. I might add the Fifth Circuit in the Leah Sigler case addressed this same issue. Again, it says a question of whether certain information constitutes a trade secret ordinarily, ordinarily is best resolved by a fact finder. The Seventh Circuit said the same thing. The existence of a trade secret ordinarily is a question of fact. Well, there's nothing extraordinary about this case. This is just an ordinary run-of-the-mill case when an employee accesses proprietary information, trade secrets, gives it to a competitor for financial gain. I think the chronology of it, excuse me. Let me understand what went on here. The district court here went back and looked at a court of appeals case in North Carolina, looked at the six factors there, as I understand, found three and then said all three are not met. My first question is, do you think that's the state of law in North Carolina, these so-called six factors that came from the restatement? Because I didn't see any sightings of those factors whatsoever in the Manley case, which is a Supreme Court case that just came down. Yeah, that's true. I think, though, generally the courts and all the circuits have used these six factors, not as Judge Fox did, where you may want to make findings of fact, but you use them just as guidance as you look at the totality of the evidence before you and decide whether or not there's, in this case, a trade secret. Judge Fox did not use them for weighing or at least in terms of a guidance. Do you think he used them as though they were all mandated? I think some, well, the courts have said each factor is not dispositive, and it's just guidance. Sometimes the factors won't apply. Like in this case, the judge said, well, you didn't give me a dollar and cents value of this protected broker list. Well, you can't do that. There's no way to put a dollar and cents value on something like this. This is not like a piece of software that you hire IP architects to spend thousands of dollars developing. Isn't that the problem with your theory of the case? Where's the proximate causation? Where are the damages? I mean, there's really nothing in this record that I saw that would show that damage resulted from this. Well, the damages is found and set forth in Exhibit 57, Your Honor, where the COO of 360 prepared his report, and he compared as the Fifth Circuit case of the Schultzer case where you look and see what is the economic activity before the list was taken compared to the economic activity nationwide. And if you look at the graph that is shown on JA-1898, it clearly shows that while these brokers, this list was maintained by 360 secretly, the economic activity of 360 paralleled exactly. The nationwide business as it was doing. So you're saying that the North Carolina factors don't come into play, or you're saying they're a matter for trial? In other words, the fact that 360 lost its funding through Bank of America or certain warehouse funding apparently that they didn't have an agent who replaced Ms. Glenn in North Carolina. So there were a lot of other reasons that could have been. But you're saying those are for the jury? Absolutely. Those are the factors that may be considered by the jury. But the fact that the theory set forth in this exhibit by 360 that once the brokers list went over to Stonegate in the last quarter toward the end of the year, 2011, if you look and see what happens, 360's work of economic activity in North Carolina continues on a decline, and it bottoms out. But as far as the nation is concerned. You didn't have an agent in place then, right? Well, we didn't have an agent in place there, but you don't have to have an agent in every state, and we don't have an agent in every state. But it's a factor for the jury to consider because if you look at the graph nationwide beginning in 2012, January 2012, it went straight up. Lots of activity, lots of economic, lots of loans being made. North Carolina, just the opposite. Approximate cause that you brought up here. The statutory definition of misappropriation includes the acquisition of trade secrets. So is proximate cause of damage even required at the summary judgment stage? No, sir. I don't think so. So I'm trying to understand your answer to Judge Keenan. If it's not even required because all you're dealing with is trade acquisition, then what was the answer you were given earlier? The real issue is Judge Fox says this broker list, this protected broker list, a list that was kept secret by 360, and he acknowledged that. He said that's not a trade secret. That's the bottom line. It is a trade secret. North Carolina courts have held that a number of things are trade secrets. So to make me clear on that, the question of trade secret itself had nothing to do with approximate cause of damages. That's right. Right. But if you have no evidence of damages, summary judgment is appropriate, right? That's right. It is. But we do have evidence. And, again, I refer back to J.A. Page. You're talking about Weiss-Malik's affidavit? Yes. J.A. 1895 is where it begins. And this is identical, identical to the case from the Fifth Circuit, the Souza case, where Mr. Clark had a non-compete agreement with Souza to market. I'm still confused on this approximate cause, and if you don't have that, because the plaintiff here sought both injunctive and monetary damages. And so I'm still confused in terms of your answer that you just gave to Judge Keenan, that that's right if you don't have approximate cause. If you don't show the damages, summary judgment is appropriate. How is it appropriate here when approximate cause is not even required in the analysis? Well, I think really there are two issues here, Judge, and one is whether or not this is a trade secret. That's the major issue, I think. I got that part. I know. I got it. But I think we all point to that. It's the approximate cause that flows from it that I'm confused about. Yeah, your brief doesn't mention injunctive relief that I could see. We didn't see conjunctive relief. We sought damages, monetary damages. Okay, so just pardon me, not damages. The cat was out of the bag by the time the case, they already had the list, and there was no way to unring the bell in this case. So the only real relief was monetary damages, and that's what the COO did just like in the Souza case. He had a graph. He showed the economic activity before the list was stolen compared to the national list. Then he showed what happened after the list was stolen. Nationally, the activity went way up. You're saying Judge Fox just said that was speculative, but they really didn't have a basis that that was the determination. Well, they can't have a basis to say that. This is the jury may reject this analysis, but at least we have an opportunity to give it to them and show it to them and argue these other factors that you mentioned, Judge. That's something the jury will consider as well. But we don't have to show this is the only thing that was going on. There may be some other factors at play. But this just has to be one of those factors, not even the predominant factor, but just a factor that caused economic damages. And if you have to take the light most favorable to 360 at the sum of judgment state, you have to take it light most favorable. North Carolina law does say that the damages, I mean, that the misappropriation has to be a substantial cause of the damages, right? Right. So you agree there has to be some quantum of proof. It does. You're saying Weiss-Malik said that. It does say that. And, again, I'll just go back and say, Judge, is it substantial? We say it is. Ultimately, the jury has to make that determination. What is it about what essentially are customer names and lists in this case, which generally as a matter of law is not protected information, what is it about these particular lists that make them different? Well, these approved brokers were vetted by 360. They were examined by 360 as far as their worth was concerned in the market. They had to be computer literate, understand the Internet and how that worked. They had to be the best of the best. They had to produce more money with less problems. Is there any evidence in the record on how much time and money was expended in vetting? No, there's not. Other than there was considerable time. But this is an ongoing process. New brokers come in and are on the list, and then some either retire or are taken off the list if they're not productive, as it turns out. But it's an ongoing process that 360 uses. But as Judge Fox found, they went to great lengths to protect its secrecy so that nobody else could get them because this made them highly profitable. How many brokers are we talking about? Well, on December 2nd, Ms. Glenn faxed. She accessed this protected database that she had access to, limited access, and she faxed 30, that's at Exhibit Number 18, accompanying emails, and then she faxed 30 brokers' lists to them. If she had not done that and simply relied on her memory to solicit this business, would we still have a case? No. If she could rely on her memory to do this, I don't think there's any way we could enforce her because she was not supposed to take any confidential information with her. But from a practical matter, and she signed all kinds of things before she went to work, but as a practical matter, I don't think you can keep someone from remembering somebody's name. I don't think you can. But that's not what happened here. She sent not only the list, but she also sent their activity, economic activity, showing the amount of work that they were doing. These are really, really top-notch brokers, and you need them, and you know the next day after they got the list, what did they do? She and her soon-to-be boss, because she hadn't resigned from 360, started contacting these brokers and went to see them, come work with us, hear the applications, fill them out, and that's exactly what happened. The three factors that are really important, I think, in this case, are the first three, because it doesn't matter how much money you spend or how much time you spend in developing some proprietary information. If you don't take all reasonable steps to maintain its secrecy, it can never be a trade secret, and that's exactly what happened in this case. Even Judge Fox found the first three factors, he says, weighs in favor of 360. They took every reasonable precaution to maintain the secrecy of this approved broker list, and that alone should establish a prima facie case that this is a trade secret. At least it's a question for the jury. How can just simply that these people were vetted and approved be a trade secret when we don't know that there's any inherent value at all to that? We don't know. Quite frankly, I don't think you need to know at this stage, Your Honor, because we say, and there's plenty of evidence that we believe that these have a great deal of value to them. Even Judge Fox said the value to 360, and he was weighing factor number one, he said the value is that these brokers are pre-screened. They've been vetted. That information is not public knowledge. Right. I'm just looking at the definition, though, the statutory definition. Business or technical information, including but not limited to formula, pattern, program, device, compilation of information. So you're saying it's a compilation of information? Yes, it is. Okay. Is there anything else under the statute other than a compilation of information? Judge, I'll have to look at the statute when I sit down. I'll come back and tell you what I think. But let me say this. The North Carolina Court of Appeals in the Sunbelt Reynolds case, this has been cited by approval by this court. Here's what the North Carolina court said. North Carolina courts have held cost history information, price list, pricing formulas, bidding formulas, and customer lists to be trade secrets. I thought the Manley case sort of settled that. I thought they held that customer lists can qualify as a trade secret. The Supreme Court case just happened a couple of weeks ago. Yes, sir. Yes, it can. Yes, sir. That's right. It did. It can qualify as a trade secret. The North Carolina court said specifically, Sunbelt said specifically, said customer lists are trade secrets under North Carolina law. And this broke a list. What was difficult is the legislature went out of its way to try to define trade secrets. It gave two elements to it. Then you've got the six factors that are listed by the Court of Appeals, which are derived back from the restatement. Yes, sir. When you look at those six factors, five of them just really go to that first element of trade secret, and the sixth one goes to the second element. But if we use it as a mandatory requirement, which it looks like the district court may have, the difficulty arises because they're not being used for guidance on those factors. The definition of trade secrets is statutory, which the Supreme Court in Manley didn't even talk about five factors or six factors, just talked about the two factors under the definition. That's right. These factors. So why don't you do so? Well, I'm trying to, Your Honor. I'm trying to say these six factors that Judge Fox used as if they were mandatory to be weighed and fact-finding being made of age when it's not the right way to do it. These are just factors. Some may apply depending on the circumstances. Others may not. But they're just guidance that you use when you ask the question, is there sufficient evidence here for the case to go to the jury? That's all it is. And as the courts have all said, you know, what is the definition of a trade secret is the most difficult and the most elusive definition to give. Therefore, ordinarily, whether it's a trade secret or not, regardless of the six factors and all that, it's a question of fact for a jury to determine. All right, sir. Thank you. Ms. Butler? May it please the Court. I'm Jenna Butler here on behalf of Home Point Financial. I will refer to them as Stonegate Mortgage because that was the entity's name when Judge Fox ruled, and that's how we've referred to them in the brief. I'd like to jump ahead to the issue of causation. As you all have noted, and, Judge, when the remedies are in 66-154 of the North Carolina statute, and the statute specifically states they pretty much indicated they didn't ask for injunctive relief. Correct. I thought I saw that complaint. Maybe they took it out of the complaint. I thought it was in the complaint. They did not file this lawsuit for two years after the acts that occurred, so I think they realized an injunction was not going to survive. So all they have pursued throughout this case are monetary damages, and the statute specifically says you have to prove causation, and the cases of this court specifically. What statute indicates that? Well, 66-154 says that if, and this is in 66-154A2, the very last sentence, if the use of the trade secret has no adverse economic effect upon the owner of the trade secret, the only available remedy shall be an injunction against disclosure. So monetary damages here are the only remedy being sought. And the case law also discusses proximate cause. For example, Judge Diaz authored the Four Circuits RLM case, which skipped to the issue of misappropriation because this issue before us, which was the existence of a trade secret, had been admitted below. But Judge Flanagan in that case, Fourth Circuit didn't reach it because they agreed with Judge Flanagan's first analysis that there was no misappropriation. But she has a full discussion of the proximate cause element in a misappropriation case, which was a second basis for her ruling below, but, again, did not have to be reached here. Let me understand. So you're saying one can have a misappropriation of trade secrets by the acquisition of a trade secret illegally, but if there's no damages, then there's no cause of action? Correct. I mean, unless you want to seek an injunction. And that's what the statute says. You can get an injunction against disclosure. But at the summary judgment stage, all you need is just to be able to show the acquisition of a trade secret. Your Honor, I disagree with that. And that's where I do think the distinction in this Court's RLM analysis is important, because throughout 360's brief, they cite the Fourth Circuit, Judge Diaz's opinion, in the RLM Fourth Circuit case for the fact that a prima facie case of misappropriation gets you through summary judgment. But it has to be remembered that that case did not address the issue Judge Fox addressed. In that case, it's clear the confidential information at issue was admitted to be a trade secret. So the only issue was, was it misappropriated? Our case, Judge Fox doesn't even get to the misappropriation, because you have to go back to 66-152, which is the start of our North Carolina statute, and has the definition of trade secret. And here, it was required that 360 meet its burden of specifying what its trade secrets were with particularity, and then also demonstrating that the information that it specifically identified here, really only the outlook lists and the facts, that they were trade secrets. Now, as noted previously, the outlook list, these were not maintained on the secure website. That is, it's clear from the record, if you read all of their sites, for the information that was on the secure server, refer to the facts. If you read the deposition testimony and look at the exhibit screen, refer to, and I was there, I handled this case in the lower court, I know what they were referring to, and the record is clear what they were referring to was the facts, not the outlook list. It is undisputed that the outlook lists were put on Glenn's personal laptop by her, maintained by her, not on any secure website, not on any password protection, and were merely emailed to herself. It's as if she brought a Rolodex with her after 20 years in the industry, and she took it with her. So I just wanted to clarify that piece about the outlook list. Now, with respect to the facts, we get to the issue of, are they a trade secret? Judge Fox correctly weighed the six factors, the six guidelines, that both the North Carolina courts in Combs and other progeny and... The North Carolina Court of Appeals. The North Carolina Court of Appeals, but I believe the... The court didn't even mention them in the Manley case. In my recollection, and I didn't have that case to... I think it was a 12B6 case, and so they didn't dig deeper, as a summary judgment motion would, and were just, I believe, and I have read that case, and I am familiar with it, but I did not find it pertinent to today, and my recollection is the reason is because it was a 12B6. The question was whether there was a trade secret. Right. The question was whether it was pled. But still, you have to establish that there's sufficient evidence to be able to... The claim is stated sufficiently to be able to establish the elements of it. Correct, and, for example, in North Carolina, it is correct. There are a plethora of cases, including some that I've been involved in, where customer lists have been found to be trade secrets, and so, in general, at the pleading stage, a customer list might be fine to sufficiently plead a trade secrets case, but when you get to the summary judgment stage, if you look at those cases where customer lists were found to be trade secrets, they generally contain more information. For example, in the GE Bets case, there was a lot more. There were years and years of information. It had the names of the customers, and then column after column of additional information, so while they were referred to as, quote, customer lists, they were more than names and contact information. Here, the outlook list, there's absolutely no evidence that they were anything more than names and contact information, but I do want to get to the issue of causation, because I think there are some really important cases, and there is a distinction in the Sulzer case that the 360 relies on heavily. First of all, it's... I say 360 often. No evidence of any monetary damages. Correct. What about Weiss-Malik? So, Weiss-Malik's reports, and they are in the appendix, and they're cited, too, by both us and by them. Weiss-Malik's reports simply say, our sales in North Carolina dropped, and they didn't drop elsewhere. That's all they say. There is no link between any misappropriation and this drop. And, for example, in Sulzer, which they cite, which is a Fifth Circuit case applying Oregon law, there is no misappropriation claim. That was a covenant not to compete involving the sale of heart valves, where the employee agreed to be the exclusive seller for the entity and to exclusively sell those. So the court found, and in that case, there were eight pieces of evidence, and this is in the Sulzer case, 257F3, and it's at 458. The court lists, I'm sorry, seven different pieces of evidence on the issue of damages. Only one of which was this drop in sales, and what the court specifically found was that, but for the interference of taking this employee, we think that the jury could find that the sales dropped. Well, in our case, Glenn's departure is not actionable. She did not have a non-compete, and she was free to go to a competitor. So all Sulzer says is, if you have a drop in sales, that might be indicative that the loss of the employee in a tortious interference with contract case, such as that one, might be indicative that the employee's departure, and you're picking them off, is indicative of damages. But it absolutely does not stand. It wasn't even a misappropriation case. And here, all the Weiss-Malik reports do is say there's a drop in sales. You're saying that in order to have prevailed, they would have to have had evidence that the drop in sales was caused by the customer list being transferred to another entity. Absolutely, or at least linked. And there's no link here. In fact, Weiss-Malik admits, and this is at JA 1225 to 1223 in his deposition, he didn't speak to a single customer. He didn't say, hey, why are sales not coming to us? He can't identify a single loan that he contends 360 would have gotten but for a bad act of Stonegate. Doesn't the evidence in the record indicate that for a period of time they had no representative in North Carolina to garner sales? Absolutely, and that's another extremely important fact. First of all, when Glenn joined, they say, well, we've been in the industry for 18 months. Well, for the 10 months prior to her becoming the sole account executive in North Carolina, they didn't have anybody. They had only six funded loans in North Carolina when she came. How do we evaluate that in terms of summary judgment? Mr. Wilkins is saying it doesn't matter. I mean, there may have been other causes, and they may be found by the fact finder ultimately to have been intervening causes. Absolutely. And superseding causes. And let me get to that because the second part of what Judge Diaz was asking is that after she left, she was the only North Carolina account executive in North Carolina for 360. And understand, she's the boots on the ground. She's the one dealing with these customers, not the people off in Texas. She's the one who has these relationships. She'd been in there 20 years. She leaves. For 15 months, they don't hire a salesman in North Carolina. They want to get lost sales without a salesman, and that's exactly what they're trying to seek. How do we evaluate that? It's sounding to me like a jury argument. Well, in the Charlottesville Music case, which is this court's Fourth Circuit case, it's 655 F. Second 38. In that case, for example, there was a sales decrease. But the court said that Magniopan, I don't know if I'm pronouncing that right, did not offer sufficient proof that the business decline of its Virginia Beach retailer was caused by the tortious conduct. Magniopan failed to establish a sufficient direct causal connection between the decrease in sales and the product disparagement. There, as in here, all they relied on was a report from the president of their company saying their sales had decreased. And similarly, in Cottom. Is that the report referenced in 1895 that deals with the interim partial damage analysis? I'm sorry. Is that the interim damage analysis? Yes. So Mr. Weissmalk had two reports. He had his initial damages analysis and then an interim. So there are two reports. The report comes down to, is this report sufficient to show damage to survive summary judgment? And it doesn't show causation. There's no causation in there. It's just a fact report. What it does allege is that you've got a nationwide look at how things are going, and then when Ms. Glenn took certain names, and then when she left, you had a drop. Yes, but they didn't hire somebody for 15 months. And for example ---- Not that, but I'm trying not to be the jury here to determine what caused the drop. If it is sufficient to say we can give it to a jury, and maybe the proof will show once you have a trial as to what caused that drop. But do you have to go into the specifics of all of it here? You have to present more than speculative conjecture. You absolutely do, especially here. The only customer testimony ---- And you have a profit margin. Then you've got someone who takes a list of what Mr. Wilkins termed a very valuable list, people who have been vetted. And then she goes off with them, even while she's still working for the company. She's then with her soon-to-be new boss to meet these new people. And, in fact, after she leaves, boom, it goes down. Is there a factor to determine how quickly it goes down? I mean, maybe a jury could look at this. Or should we just make that decision? Well, no, Your Honor. There are a lot of facts that are undisputed in the record that go to that. For example, the way this industry works. The way this industry works is that these customers are not exclusive. For example, if I'm a mortgage broker, I may do business with all of you all. You all offer different products. Your rates are published. That's not the issue. The issue has to do with someone who develops and identifies a list of customers who are really, really good customers. Yeah, it's not exclusive. Anybody can go out and develop a list. But if you go through the compilation of this list, at least for the manly, potentially that's a trade secret. If you go and do that hard work of pulling this list, and then you've got an employee who takes that list and then rides around with her potential new employer and introduced them, and then sales drop, we only talk in summary judgment. Why can't a jury look at that? Well, for example, there is absolutely no evidence to tie the customers they met with to that list. Those were all loans that she brought to 360. Those customers, most of whom she already had existing relationships. And there is absolutely no evidence that any of the customers on that list would have done business with 360 but for something Glenn or Stonegate did. There is no loan identified anywhere in the record that anybody claims would have come to 360 but for some act. There's absolutely no testimony from any customer that they would have done business with 360 but for some act. I was going to say the only customer testimony, which is in the record, are customer affidavits saying that there are multiple intervening causes. And that's where we get to when you have multiple intervening causes, a lot of ifs, ands, and buts, which existed here. Could they have funded the loan? Was their product competitive? Was their rate competitive? Would this broker have even done business with them but for anything? And the customers have testified that nothing, nothing, Glenn or Stonegate did cause them to not do business with 360. And because of those... That's why I want to even help in something like this. Their advantage is to get the loans and they've got someone to come around and do it in a nice way. So why would they come back and say, well, the only reason I'm doing it with them is because of her, which would indicate potentially something illegal. What incentive would they have to come and provide that information? So they work for the end consumer and they want to get the best product at the best rate. So while the personal relationship is extremely important, they're not going to offer their end consumer a loan that isn't the best possible product out there. That's why they shop these... They have the advantage of someone here who's worked with both. But see, all these people... Who can then, by virtue of her knowledge of one company, play it off against the other one to them to say this is better and work up a package. So what incentive would they have to come back and say, well, the only reason I came here is because of her? When all they're interested in is, as you say, their customers. And if their customers are benefiting from it, they don't care about a list that's exclusive to 360? This industry doesn't work as a bidding process, though. The rates are published and the products are different, so the different lenders have different products that they sell that they do better in. And remember, Stonegate had its own vetting process. It would get from the brokers the information they wanted. One last question on this, because it's kind of interesting. It seems to me your argument is that the list was really worthless. I mean, it wasn't all that much to it. But, I mean, she tried to get this job, and they made an offer to her. And it was only after she brought a list to them of all these people that they upped the salary and said, OK, we're going to give you a very substantial. I don't know what it was. I forgot the record on that. But the point being is that there has to be some value here because it caused Stonegate to up its offer to her. It's typical in the industry if you're moving. And this happened when she came from Wells Fargo to 360. They say, hey, what's your pipeline like? Pipeline is what do you have in the works? Let me kind of see what you might produce on a monthly or bimonthly basis so I can see what revenue I might make versus what I'm going to offer you. Just as when she came to 360, she sent her Wells Fargo pipeline, she sent her 360 pipeline purely for negotiation of compensation. And it's undisputed in the record that nobody used that for anything but to say, OK, here's what we're going to offer you for compensation. So that was the only time the list was even used, and it's unrefuted that it wasn't referred to when this in-between time when she was training with Stonegate before she left 360 and when her manager knew she was getting ready to leave. And she was still, see, her customers are her bread and butter, so she was still actively putting loans through 360. In fact, it's unrefuted that even after she left, loans that were in her pipeline closed. So she did not want to hurt these customers at all, and that list was only of value in negotiating compensation, and that's unrefuted in the record. I see my time is about up, and I know, Judge Keenan, I think you had a question that maybe didn't get answered, and I want to be sure to answer. Yeah, no, I'm just wondering here, what does the record show regarding Stonegate's profit after Glenn joined them? Your Honor, I am not sure it is clear, and one of the factors that weighs into that is when she left 360. Let me tell you the reason why I'm asking the question, because Mr. Wilkins is saying it's sufficient to survive summary judgment to just show we lost in North Carolina. My question to you, is there a requirement to show also that Stonegate gained? And if so, is that information in the record? Your Honor, I think it's important to show that Stonegate gained from the misappropriation of trade secrets. Absolutely, and that is the element that is 100 percent missing. There is no link between anything that Stonegate either gained or 360 lost and any misappropriation of trade secrets. All there is is the speculative notion that business was lost, but the loss of Glenn is not actionable. They didn't hire anybody for 15 months, and they cannot show that there are loans, specific identifiable loans, or specific identifiable customers that they lost because of anything. What about raw numbers in terms of how the business went up once she arrived?  I don't believe that's in the record. If it is, I cannot point you to it. But she was doing what's called correspondent business. A lot of that when she went over to Stonegate, and they weren't even doing that at 360. So it's apples and oranges, plus, may I finish? I'm sorry, my time is up. Plus, I think you would have to link it to the customers that she allegedly stole information on. You're saying because it would have to show the use of the list generated profits. Yes, exactly. Are there any other questions? I know my time is up, and I didn't get to address everything. Thank you very much. Thank you. Mr. Wilkins. What about Ms. Butler's last point? She's saying there's no evidence in the record that Stonegate gained from the use of the customer list, that you've merely shown that the revenues at 360 went down. Is there any evidence that Stonegate gained from the use? I don't think either party offered any evidence as to the gain to Stonegate. What we offered or what was offered is, as I go back to the Schuessler v. Carbon Medics case, we offered a graph and an explanation that when she left and took the approved list with her, that sales of mortgages went downhill in North Carolina, while simultaneously they were going skyrocketing in all other states in the nation, even states where there was no account executive. You're saying that there is no requirement to survive summary judgment and proximate causation to show that Stonegate profited from the use of those customer lists? I don't think so, Judge. I don't know the answer to that either, but it seems to me that's important. Well, I think it would be important if we had it, but back to what you asked about what North Carolina describes as a trade secret, and it does. And we do say it's a compilation of information, and then go to the next paragraph that has potential commercial value. And a customer list, and that's what this approved broker list was, was nothing more than a customer list. And it was of great value, of great value to Stonegate, because, you see, they were just coming into North Carolina. They had no business in North Carolina. And that's why when they got this broker list, what did they do? The next day, Mr. Lockmandy, who worked for Stonegate, and Ms. Glenn, who was still on the payroll of 360, started contacting these brokers. And then before she left, right before she resigned on the 14th, on the 12th, she went back into that database and accessed that same information again. And she was asked during a deposition, why did you do that? She said, I guess I just wanted to make sure that I had it. Well, why would you want to make sure you had something that was of no value? And I will say, Judge Winn, to your question, the reason we address proximate cause in our brief is because Judge Fox found as an alternative basis that we lose because we did not show proximate cause. But I would just again refer the court to this Fifth Circuit case. It's right on point. And if you take the parties' names from the Fifth Circuit case and replace them with the parties' names in this case, the opinion will read the same because it's the same theory, the same graph, the same. For example, most significant in the Fifth Circuit is the evidence that Carl Benmedick's sales dropped after this fellow breached his non-compete, which doesn't make any difference. Well, you still say you violated non-compete. You're still harming your former employer if you're taking business away. And that's what he did in the Fifth Circuit. The Fifth Circuit said sales dropped in Oregon 40 percent, while business grew by a wide margin nationwide otherwise, where he was not working. So I think that, again, we're at summary judgment stage. And there's an inference there, even taking what Judge Fox wrote, that we have a right to at least present our case to a jury and have these issues that we've been discussing resolved by the appropriate fact finder. Thank you very much. All right, thank you. We will adjourn court and then come down to brief counsel.
judges: Barbara Milano Keenan, James A Wynn Jr., Albert Diaz